## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:20-cv-80729-AHS

**DEBRA HENRY**,

      Plaintiff,

v.

**RON DESANTIS, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
STATE OF FLORIDA**,

      Defendant.

_____/

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT, OPPOSITION TO EMERGENCY INJUNCTIVE RELIEF, AND INCORPORATED MEMORANDUM OF LAW

At issue in this case is the constitutionality of the Governor's Executive Order 20-112 and "prior Orders regarding [the] same." DE 1 pp. 1, 6.[1] These Orders, issued in response to the Novel Coronavirus Disease 2019 (COVID-19) pandemic, mitigate the spread of the disease by limiting operations of some businesses, occupancy of certain buildings, and movement of persons into, and within, the State. Because (1) Plaintiff lacks standing, (2) her state law claims are barred by the Eleventh Amendment, and (3) her Complaint fails to state any claim upon which relief can be granted, the Court should dismiss. Alternatively, because Plaintiff cannot demonstrate the need for emergency injunctive relief, the Court should reject her request for this extraordinary remedy.

---

[1] This overview relies on publicly available government Orders, which are subject to judicial notice. *See, e.g.*, *Smith v. Sec'y of Veterans Affairs*, No. 19-13189, 2020 WL 1655938, at *1 (11th Cir. Apr. 3, 2020) ("When ruling on a Rule 12(b)(6) motion to dismiss, the district court is permitted to take judicial notice of public records without needing to convert the motion into a motion for summary judgment[.]" (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-78 (11th Cir. 1999)).

## BACKGROUND

**A.** In late 2019, a novel infectious respiratory disease was detected in Wuhan, China. This virus, eventually named COVID-19, spread rapidly across the globe, leading the World Health Organization to declare a Public Health Emergency of International Concern and a global pandemic. When two Florida residents tested positive the first week of March 2020, Governor Ron DeSantis issued Executive Order 20-51, which directed the Florida Department of Health to declare a Public Health Emergency. *See* https://www.flgov.com/2020-executive-Orders/ (listing all of the Governor's publicly available Executive Orders related to COVID-19). On March 9, Governor DeSantis declared a State of Emergency by issuing Executive Order 20-52.

Since his March 9 state-of-emergency declaration, the Governor has signed several Executive Orders designed to minimize social congregation while encouraging creative business practices. In Executive Order 20-68, he suspended the sale of alcoholic beverages for on-premises consumption. In Executive Order 20-70, he prohibited food-service establishments in Broward and Palm Beach Counties from allowing on-premises consumption, but he permitted them to fulfill delivery orders. And in Executive Order 20-71, he extended the on-premises food consumption ban statewide but authorized "all vendors licensed to sell alcoholic beverages," including restaurants, to sell alcoholic beverages in sealed containers for off-premises consumption (so long as the beverages accompanied a food order).

Subsequent Orders restricted the movement of persons. Executive Order 20-91, for example, directed all persons in Florida to limit their movements and personal interactions outside the home to those necessary for obtaining or providing essential services or conducting essential activities. Notably, the "essential service" exception included an allowance for those who worked at restaurants and other facilities that prepare and serve food.

On April 29, 2020, the Governor signed Executive Order 20-112. The April 29 Order triggered "Phase One" of Florida's reopening by cautiously removing certain restrictions on the movement of persons and the operations of restaurants in all but Palm Beach, Miami-Dade, and Broward Counties. With the May 9 issuance of Executive Order 20-120, the Governor extended Florida's Phase One reopening to Palm Beach County. Restaurants in that jurisdiction and in other Phase One jurisdictions may now operate at 25 percent occupancy. Importantly, these Orders left in place the authorization for food delivery and for licensees across Florida to sell alcoholic beverages for off-premises consumption.

**B.** Plaintiff, a bar-industry veteran, filed her Complaint on May 1, 2020. DE 1. Until March 17, 2020, she worked at a bar (Pit Row) and a restaurant (Buffalo Wild Wings) in Palm Beach County. DE 1 at ¶¶ 2-3, 5. In her view, the Governor's Executive Orders are unconstitutional because they closed her places of employment and caused her to lose her jobs. DE 1 at ¶ 16. Although she recites no fewer than seven provisions of the United States and Florida Constitutions, she states that her "cause of action is solely related to the lack of authority of [the Governor] to enter these [O]rders." DE 1 at ¶ 24. She seeks an emergency injunction vacating Executive Order 20-112 and "prior Orders regarding [the] same." DE 1 at pp. 1, 6.

## LEGAL STANDARDS

Under Rule 12(b)(1), the Court must dismiss the Complaint if it does not establish "a basis of subject matter jurisdiction." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).[2] Under Rule 12(b)(6), the Court must dismiss the Complaint unless well-pleaded facts or reasonable inferences from those well-pleaded facts provide grounds for relief. *McGinley v.*

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted all decisions of the Fifth Circuit decided before September 31, 1981.

*Houston*, 361 F.3d 1328, 1330 (11th Cir. 2004). In assessing these questions, "[i]t is not . . . proper to assume that [the plaintiff] can prove facts that [he or she] has not alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (second alteration in original) (citation omitted).

A party seeking a preliminary injunction must show that: "(1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "Because a preliminary injunction is an extraordinary and drastic remedy, relief may not be granted unless the movant clearly established the burden of persuasion as to the four requisites." *Callahan v. DHS*, 939 F.3d 1251, 1257 (11th Cir. 2019) (citation and internal quotation marks omitted).

## ARGUMENT

### I.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED.

#### A.   Plaintiff lacks standing.

"The standing inquiry 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009) (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, a plaintiff must show (1) injury-in-fact, meaning a concrete and particularized invasion of a legally protected interest; (2) a causal connection between that injury and the complained-of conduct; and (3) redressability, meaning a favorable decision will eliminate the injury. *Lujan*, 504 U.S. at 560-61. The Supreme Court has held that if "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," a stronger showing is needed, making standing "substantially more difficult" to establish. *Id.* at 562 (citation omitted).

According to Plaintiff, she lost her jobs as "a direct result of" the Governor's Executive Orders, DE 1, at ¶ 2, and vacating the Executive Orders will remedy that harm. But the Governor's Executive Orders were not the cause of her injury, nor would vacating them restore her employment. This is because Executive Order 20-112 and its predecessors did not command her employers to fire her. Nor did they foreclose other means for her employers to continue operation, such as sale for off-premises consumption.

The Executive Orders prohibited certain establishments, like bars and restaurants, from engaging in one form of commerce: the sale of alcohol and food for *on-premises* consumption. Bars and restaurants were always able to operate in some form; indeed, the Governor encouraged "creative business practices that safely serve consumers during this temporary period of distancing." Executive Order 20-71. He specifically authorized take-out food options[3] and to-go alcohol sales (which were previously unlawful) to facilitate continued operation and profitability of bars and restaurants, *id.* at Section 1(B). That Plaintiff's employers did not take advantage of these options or choose to retain her is, regrettably, beyond the Governor's control.

Even assuming Plaintiff had correctly characterized the Executive Orders, her arguments regarding causation and redressability would fail. The key provisions of the Executive Orders Plaintiff cites for the source of her injury governed the activities of her employer—not Plaintiff herself.[4] Per *Lujan*, when a plaintiff is not the object of the challenged government action, standing requires a heightened showing. *See* 504 U.S. at 562. "In that circumstance," both the traceability

---

[3] Even Executive Order 20-70, now expired, expressly provided that it did "not apply to delivery services, pick-up or take out services provided by" bars in Palm Beach and Broward Counties.

[4] Although Executive Order 20-91 and Executive Order 20-112 placed restrictions on the movement of individuals, these Orders came long after Plaintiff's termination occurred on March 17. Moreover, both Orders authorize individuals to travel to places of employment that prepare or serve food. Executive Order 20-91.

and redressability inquiries "hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* Because these "essential elements of standing 'depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *Id.* (citations omitted)

Plaintiff has failed to satisfy this heightened burden as to either causation or redressability. Regarding causation, "*Lujan* explained that an injury is not fairly traceable to the actions of a defendant if caused by the 'independent action of some third party not before the court.'" *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012) (quoting *Lujan*, 504 U.S. at 560). When Plaintiff's employers, two third-party businesses, ended her employment on March 17, they did so not at the behest of the Governor but despite the Governor's best efforts to balance a response to the COVID-19 pandemic with measures designed to protect all employees, like Plaintiff, in the food-service workforce. For that reason, the injury she alleges she suffered (termination) is not fairly traceable to the Governor.

Plaintiff's claim of redressability fares even worse. "Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (citation omitted). To demonstrate this prong, a plaintiff must show that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation omitted). The redressability inquiry thus requires the Court to examine whether it is "the effect of the court's judgment on the defendant—

not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (internal citations omitted).

Plaintiff's sole grievance lies with her job loss, and an Order vacating the Governor's Executive Orders would not force her employers, both absent third parties, to rehire her. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997) (stating that nonparties are not bound by a court's judgment). Nor would vacatur "indirectly" remedy her purported injury. Restaurants in Palm Beach County may now serve food and drinks at limited occupancy. Even if Plaintiff's employers were permitted to offer on-premises consumption without any limitation, they would not be forced to do so. As the Plaintiff herself avers, "[b]usinesses are free to remain closed," notwithstanding the state's move to Phase One reopening. DE 1 at ¶ 22. And she admits that "citizens are free to stay home and not patronize any business" at all, so it remains entirely a matter of conjecture that her former employers' respective needs would rise to the level of requiring pre-pandemic staffing. DE 1 at ¶ 22. Finally, Plaintiff has not established that, even assuming best-case speculation for Florida's reopening, her employers would likely rehire her.

**B.      The Eleventh Amendment bars Plaintiff's state constitutional claims.**

"The Eleventh Amendment to the Constitution bars federal courts from entertaining suits against states." *Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1302 (11th Cir. 2005). Although *Ex parte Young* provides an "exception to this rule for suits against state officers . . . to end continuing violations of *federal* law," *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000) (emphasis added), the Supreme Court has disallowed causes of action contending that "a state official has violated *state* law," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). The *Pennhurst* exception exists because "[a] federal court's grant of relief against state officials on the

basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106.

Some of Plaintiff's claims allege that the Governor's Executive Orders violate various provisions of the Florida Constitution, specifically, Article I, Sections 1, 2, and 5, and Article IV, Section 1. In other words, Plaintiff's suit requests that "a federal court instruct[]" a "state official[] on how to conform [his] conduct to state law," which is a request the Supreme Court characterized as a "great[] intrusion on state sovereignty." *Pennhurst*, 465 U.S. at 106. For this reason, such requests may not be adjudicated by federal courts. *See id*. at 121 ("[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."). Because *Pennhurst* dictates that these claims must be dismissed as running afoul of the Eleventh Amendment, the Court should do so here.[5]

### C.    Plaintiff has failed to state any claim.

Should the Court decline to dismiss the Complaint for lack of jurisdiction, Plaintiff's Complaint is nonetheless subject to dismissal in its entirety under Rule 12(b)(6). Plaintiff asserts that the Governor's Orders are unconstitutional both on their face and as applied.[6] DE 1 at ¶ 6. Her

---

[5] *McDonough v. Fernandez-Rundle*, 862 F.3d 1314 (11th Cir. 2017), is not to the contrary. In *McDonough*, the plaintiff sought injunctive relief barring the State Attorney from prosecuting him for violating a provision of the Florida Security of Communications Act. *Id.* at 1316. He brought suit under Section 1983 alleging that the statute did not apply to him and that if it did, it violated the First Amendment. *Id.* at 1318. On appeal, a divided Eleventh Circuit panel declined to reach the First Amendment issue on grounds of constitutional avoidance. *Id.* at 1321 n.3. The panel instead held that the plaintiff had not violated the statute and, as such, that the government's threatened prosecution had no basis in state law. *Id.* at 1316. Significantly, however, the panel remanded to the district court "for further proceedings, if necessary, consistent with this opinion" *without addressing the scope of any remedy*. *Id.* at 1321. Thus, the panel was silent as to whether a district court could even issue an injunction against a state official based on a federal court's interpretation of state law—a route foreclosed by *Pennhurst*.

[6] To the extent Plaintiff alleges that the Governor's Orders are facially unconstitutional, her Complaint fails to plausibly satisfy the no-set-of-circumstances test applied by federal and

"cause of action is solely related to the lack of authority of [the Governor] to enter these [O]rders." DE 1 at ¶ 24. She argues that authority is lacking both because the Governor has no power to enact such measures and because enaction, even if authorized, was arbitrary and unlawful. She is mistaken.

**A.** The Governor plainly has the authority to take the actions set forth in Executive Order 20-112 and its predecessors. Plaintiff suggests that the Governor cannot perform this function because the emergency power he exercised was not conferred by the United States Constitution. *See* DE 1, at ¶ 7. But the Constitution confers powers only to the three branches of the *federal* government; it does not confer power to the states. Indeed, the Tenth Amendment makes clear that "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, *are reserved to the states respectively*, or to the people." U.S. Const. amend. X (emphasis added). And courts have long recognized that the states have inherent police power to protect public health and welfare. *See, e.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905).

Courts also recognize that states have discretion to prescribe the mode or manner in which those public health and welfare goals are accomplished. *See id.* Florida's Constitution lays the foundation for the state's emergency-powers scheme. Article IV, Section 1(a) of the state Constitution provides that "[t]he supreme executive power shall be vested in [the] governor" and that "[t]he governor shall take care that the laws be faithfully executed." Art. IV, § 1(a), Fla. Const. The same provision gives the Governor power to serve as commander-in-chief over the military forces of Florida, reinforcing his role as the leader and protector of the state. Art. IV, § 1(a), Fla. Const. These provisions of the State's charter set the stage for the robust statutory scheme

state courts. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Abdool v. Bondi*, 141 So. 3d 529, 538 (Fla. 2014).

delineating the specific emergency powers vested in the state's chief executive. *Cf. Lighthouse Fellowship Church v. Northam*, No. 2:20-CV-204, 2020 WL 2110416, at *11 (E.D. Va. May 1, 2020) (noting that the state's "Take Care" clause, in combination with state emergency power statutes, gave the Governor authority to declare a state of emergency and to implement mitigation measures in response to a public health threat by a communicable disease); *Friends of DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at *8-9 (Pa. Apr. 13, 2020), *cert. denied*, 590 U.S. --- (May 6, 2020) (same).

The Governor's constitutional prerogative, as chief executive of the State, is further delineated in Section 252.36, Florida Statutes. Section 252.36 states the Governor "is responsible for meeting the dangers presented to this state and its people by emergencies," like the current global pandemic. § 252.36(1)(a), Fla. Stat. And subsection (1)(b) states that the Governor has discretion to decide how best to respond, noting that he "may issue executive orders, proclamations, and rules" that "have the force and effect of law."

Subsection (5) adds to this framework, providing a list of powers that the chief executive may exercise in response to the emergency. § 252.36(5), Fla. Stat. Three of these provisions are relevant here. First, subsection 5(a) states that the Governor may "[s]uspend the provisions of any regulatory statute . . . if strict compliance with the provisions of any such statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency." Second, subsection 5(h) gives him power to "[s]uspend or limit the sale, dispensing, or transportation of alcoholic beverages" during times of emergency. Finally, subsection 5(g) empowers the Governor to control "the movement of persons within the [emergency] area, and the occupancy of premises therein."

In responding to the COVID-19 emergency, the Governor used each of these powers. He

suspended certain statutes, curtailed alcohol sales, and limited occupancy of establishments identified as "potential gathering places for the spread of COVID-19." *See, e.g.*, Executive Order 20-70. Working within the acts enumerated in Section 252.36(5), he selectively invoked the measures which were best suited to meet the emergency and prevent further spread.

Moreover, the Governor's Orders provided direction to the Department of Business and Professional Regulation, an executive agency created by the Florida Legislature specifically to regulate certain businesses, including restaurants and establishments that serve alcoholic beverages. § 20.165, Fla. Stat. The Legislature tasked this executive agency with "supervising the conduct, management, and operation" of alcohol sales, § 561.02, Fla. Stat., and taking measures to "safeguard[] the public health, safety, and welfare" for restaurants. § 20.165, Fla. Stat. In crafting his Orders and tasking this Department with their enforcement, the Governor exercised his constitutional prerogative to directly supervise the executive agency in performance of its critical mission. *See* Art. IV, § 6, Fla. Const.

**B.** With the foundational authority question addressed, the only remaining merits issue is whether the restrictions in the Governor's Executive Orders offend the state or federal Constitution. They do not. And Plaintiff falls far short of raising a cognizable claim to that effect.

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement exists to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). Under this standard, the Court "need only accept '*well-pleaded* facts' and '*reasonable* inferences drawn from those facts.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (emphases added) (quoting *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992)). "[C]onclusory" statements and "[t]hreadbare" allegations

do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Seven of the twenty-six paragraphs in Plaintiff's Complaint (more than 25 percent of her pleading) simply recite various provisions in United States and Florida Constitutions. *See* DE 1 at ¶¶ 8-10, 12-15. Plaintiff makes no attempt to explain how or why the Governor's Executive Orders violate the First Amendment—which prohibits *Congress* from limiting freedom of, *inter alia*, speech and assembly[7]—or the Ninth Amendment of the United States Constitution. DE 1 at ¶¶ 8-9. *See Spano v. Satz*, No. 09-60255-CIV, 2011 WL 1303147, at *7 (S.D. Fla. Mar. 31, 2011) (explaining that the Ninth Amendment "cannot serve as the basis for a § 1983 claim because such a claim must be premised on the violation of a right guaranteed by the U.S. Constitution or federal law" (citation omitted)). Nor does she make an attempt to explain how or why they violate Article I, Section 2 of the Florida Constitution (which she quotes as stating that "[n]o person shall be deprived of any right because of race, religion, national origin, or physical disability," DE 1 at ¶ 13). Simply put, Plaintiff does not adequately explain her claims to allow the Governor fully to respond. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).

As is true with shotgun pleadings in general, these pleading deficiencies "waste scarce judicial resources, inexorably broaden[] the scope of discovery, wreak havoc on appellate court dockets, and undermine[] the public's respect for the courts." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (alteration in original) (citation and internal quotation marks omitted). For that reason, the Court can (and should) dismiss Plaintiff's Complaint for failure to satisfy the minimum pleading requirements in Rule 8.

---

[7] To the extent she alleges a violation of the First Amendment under an unexplained incorporation theory, this claim lacks merit. *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (finding that the Constitution does not "recognize[] a generalized right of 'social association' that includes chance encounters in dance halls").

**C.** The closest Plaintiff comes to tying any of the cited constitutional provisions to the factual allegations in her Complaint is this threadbare statement:

> [The Governor] has created an arbitrary Order that is unconstitutional on its face and as applied. [The Governor's] Order is a clear violation of [Plaintiff's] constitutional rights. The Order arbitrarily allows some business to open and others to remain closed. In addition, but not limited to, arbitrary county lines in which [sic] would disparately affect some businesses and not others of the same business type.

DE 1 at ¶ 6. And this one: "[The Governor] has violated [Plaintiff's] Fourteenth Amendment right to due process of law." DE 1 at ¶ 19. Even these statements "epitomize[] speculation and therefore do[] not amount to a short and plain statement of [her] claim[s] under Rule 8(a)." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008), *abrogated on other grounds by Twombly*, 550 U.S. 544.

Construed in the light most favorable to her, this portion of Plaintiff's Complaint appears most clearly to allege that the Governor's Orders infringe on her federal Fourteenth Amendment liberty, due process, and equal protection interests. In considering whether the Orders, all of which were issued in response to a global emergency, impermissibly invade these (or any other) constitutional rights of Plaintiff, the Supreme Court's *Jacobson* opinion provides the governing standard.

In *Jacobson*, the Supreme Court lent its imprimatur to the principle that state governments must perform "emergency exercises of state authority during a public health crisis." *In re Abbott*, 954 F.3d 772, 783 (5th Cir. 2020). The Court recognized that "under the pressure of great dangers," a state may limit certain liberties otherwise enjoyed to the extent that "the safety of the general public" demands it. *Id.* at 778 (quoting *Jacobson*, 197 U.S. at 29); *see also id.* at 786 ("*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health

emergency."). This is so because "the liberty secured by the Constitution of the United States . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson*, 197 U.S. at 26.

*Jacobson* thus established a two-part test for determining whether an emergency measure (here, the Governor's Executive Orders) comports with the Constitution: (1) Does the restriction have at least some "real or substantial relation" to the crisis? and (2) Is the restriction "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[?]" *Id.* at 31. In assessing the actions, the Court must determine whether the Governor has acted in an "arbitrary, unreasonable manner," *id.* at 28, or through "arbitrary and oppressive" regulations, *id.* at 38. But *Jacobson* emphasizes that it is not the role of the courts to "second-guess the wisdom or efficacy of the measures." *In re Abbott*, 954 F.3d at 785 (citing *Jacobson*, 197 U.S. at 28, 30).[8]

Plaintiff's constitutional claims fail *Jacobson*'s test. First, the Governor's Executive Orders have a "real [and] substantial relation" to the unprecedented public health crisis that Florida faces. With his Orders limiting occupancy and suspending sales of alcohol for on-premises consumption, the Governor aimed to stop crowding at "venues where groups of people congregate," Executive Order 20-71, a prudent action in response to "a severe acute respiratory illness that can spread among humans through respiratory transmission," Executive Order 20-68. *See also Hartman v.*

---

[8] *See also Jacobson*, 197 U.S. at 28 ("[T]he court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case."); *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996) (explaining that the scope of review in cases challenging constitutionality of emergency power is limited to determination whether the executive's actions were taken in good faith and whether there is some factual basis for the decision that the restrictions imposed were necessary), *abrogated on other grounds by Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998).

*Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *6 (S.D. Ohio Apr. 21, 2020) ("COVID-19 is a highly infectious disease that spreads easily amongst individuals. Social distancing measures have been implemented across the United States to curb the spread of the disease."). As the prefatory clauses of the Orders explain, the measures mirrored guidance from the White House advocating "far-reaching social distancing measures, such as avoiding gatherings of more than 10 people." Executive Order 20-71; Executive Order 20-68. And to the extent the Orders treated individuals in Broward, Miami-Dade, and Palm Beach Counties differently, they did so because the disease posed a heightened risk to these areas and because the Administration coordinated with local leadership who requested such assistance. *See* Executive Order 20-70.

Second, the restrictions are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. As the Sixth Circuit recently reaffirmed in a COVID-19-related case examining movement restrictions, "no one . . . has a right 'to expose the community . . . to communicable disease.'" *Maryville Baptist Church, Inc. v. Beshear*, No. 20-5427, 2020 WL 2111316, at *4 (6th Cir. May 2, 2020) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944)). Plaintiff has put forth nothing to suggest any lack of good faith, *see Avino*, 91 F.3d at 109, nor has she offered facts demonstrating that the Orders were "arbitrary" or "unreasonable," *see Jacobson*, 197 U.S. at 28, 38.[9] Indeed, her averments that "[b]usinesses are free to remain closed" and "citizens are free to stay home" suggest she recognizes

_____

[9] This situation presents a far cry from the Eleventh Circuit's recent decision in *Robinson v. Attorney General*, No. 20-11401-B, 2020 WL 1952370 (11th Cir. Apr. 23, 2020). There, the Eleventh Circuit refused Alabama's request for a stay of injunctive relief after concluding that the state failed to prove the district court abused its discretion when it held that Alabama's Order delaying all abortions unjustifiably impinged a fundamental right in a "plain, palpable" fashion. *Id.* at *6. In *Robinson*, the Court upheld the injunction because the plaintiff set forth evidence suggesting that the restriction had "no real or substantial relation" to the state's goal of protecting public health. *Id.* The state offered no contrary evidence, and, in its appeal, the state did not challenge the court's factual findings. *Id.*

the connection between pre-pandemic business operation, group gatherings, and spread of the disease. DE 1 at ¶ 22.

**D.** To the extent Plaintiff suggests that she was entitled to procedural Due Process before issuance of the Governor's orders, this contention fails as a matter of law. The Governor's Orders constitute emergency actions for the protection of the health and welfare of the people of the State. *See* DE 1 at ¶ 19. The orders, all of which "have the force and effect of law," § 252.36(1)(b), Fla. Stat., applied generally to thousands of individuals and businesses around the state; they were not targeted to Plaintiff or her employers, nor do they conceivably constitute "adjudication." For these reasons, she has already received all the process to which she is entitled. *See Hartman*, 2020 WL 1932896, at *8 ("The State's Order directing non-essential businesses to cease operating their physical locations did not violate Plaintiffs' due process rights because the Director's Order was a generally applicable Order affecting thousands of businesses, and not a decision targeting an individual or single business."); *cf. 75 Acres, LLC v. Miami-Dade Cty.*, 338 F.3d 1288, 1296-98 (11th Cir. 2003) (concluding that a generally applicable government action does not implicate procedural due process); *L C & S, Inc. v. Warren Cty. Area Plan Comm'n*, 244 F.3d 601, 602 (7th Cir. 2001) (same). Holding otherwise would place an unadministrable burden on the state during this time of emergency. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("There must be a limit to individual argument in such matters if government is to go on.").

Finally, to the extent Plaintiff argues that the Orders raise an equal protection problem, this claim, too, fails. The Governor's decision to treat Miami-Dade, Broward, and Palm Beach Counties differently than other counties was not arbitrary. Instead, his choice bore a "reasonable and just relation" to the goal of protecting the State and its people. *See McLaughlin v. Florida*, 379 U.S. 184, 190 (1964). As Executive Order 20-70 explained in its prefatory clauses, the Governor

acted in response to local authorities from Palm Beach and Broward who "requested application of the CDC recommendations." Executive Order 20-70. When the potential for spread became a statewide concern, the Governor imposed similar limits on all other counties in Florida. Executive Order 20-91.

The reasonableness of the Governor's action is further underscored by his response to the changing pandemic landscape. Palm Beach County's numbers have improved.[10] In recent weeks, data from the County revealed a downward trajectory of influenza-like illness and COVID-like illness, as well as a low percent of new individuals testing positive. That data, in addition to a request from Palm Beach County leadership, led the Governor to apply Phase One to the County. Executive Order 20-120. Palm Beach County is now in the same Phase One position, with the same individual and commercial permissions, as the parts of the State least restricted by the Governor's Orders.

## II.   INJUNCTIVE RELIEF, EMERGENCY OR OTHERWISE, SHOULD BE DENIED.

In her prayer for relief, Plaintiff argues that emergency injunctive relief is necessary to remedy the harms caused by the Governor's Orders. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). But Plaintiff has failed to establish several elements necessary to support preliminary injunctive relief. The request for extraordinary relief should therefore be denied.

### A.   Plaintiff cannot establish a substantial likelihood of success.

Plaintiff cannot establish a substantial likelihood of success for the same reasons that her Complaint should be dismissed. First, as explained previously, Plaintiff lacks standing to bring

---

[10] Daily county reports are available at https://floridahealthcovid19.gov/.

suit. The Orders did not actually cause her any injury because they did not fully close her former places of employment or mandate her termination. And vacatur would not provide her with the redress she seeks—*i.e.*, reemployment.

Second, Plaintiff's state law claims are barred by the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 106.

And third, the Governor's Executive Orders are plainly constitutional. The measures Ordered by the Governor bear a "real and substantial connection" to the goal of meeting the public health emergency, and they were enacted in good faith. They therefore do not violate her constitutional rights. *See Jacobson*, 197 U.S. at 31. Any temporary burden on her constitutional rights qualifies as a reasonable restriction to combat a public health emergency. *In re Abbott*, 954 F.3d at 778 (quoting *Jacobson*, 197 U.S. at 29); *see id.* at 786 ("*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency.").

## B. Plaintiff cannot establish irreparable injury.

Plaintiff cannot establish that irreparable injury will occur absent the Court's entry of an injunction. In her view, "[l]ost revenue combined with debt that mounts daily is, without a doubt, causing irreparable harm." DE 1 at ¶ 20.B. She is mistaken on the proper legal standard.

The Eleventh Circuit has adhered to the view that "[m]ere injuries, however substantial, in terms o[f] money, time and energy necessarily expended in the absence of a stay, are not enough" to constitute an irreparable injury. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1112 n.20 (11th Cir. 2004) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). This is particularly true of the income Plaintiff claims she lost before filing her lawsuit; "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005).

Setting aside that vacatur of the Executive Orders will not result in her reemployment, *see supra* at I.A., her purported monetary injury—assuming she could prove her case—could be redressed in the normal course.

**C.     The alleged injury to Plaintiff is far outweighed by the public interest in keeping the Governor's Executive Orders intact.**

The public interest decisively weighs in favor of allowing the Executive Orders to remain in effect. Executive Order EO 20-112 went into effect on May 4, 2020—merely one week ago. The Governor's Executive Order covers the entirety of Florida's Phase One reopening. Granting a preliminary injunction at this early stage of the proceedings would, in effect, immediately reopen the State—contrary to the Governor's best judgment and the advice of the White House, the Centers for Disease Control and Prevention, the Florida Surgeon General and State Health Officer, the Florida Department of Health, and the Task Force to Re-Open Florida. *See* Executive order 20-120; Executive Order 20-112. A preliminary injunction would undoubtedly throw the State into chaos and confusion and unnecessarily place the health and safety of Florida's most vulnerable citizens at risk. Florida's need to respond to the unprecedented public health emergency caused by COVID-19 significantly outweighs any harm caused by the continued enforcement of the Governor's Orders. This Court should maintain the status quo and deny the request for an injunction.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiff's challenge to the Governor's Executive Order 20-112 and its predecessors for lack of subject matter jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted. Emergency injunctive relief is improper because Plaintiff has failed to demonstrate a likelihood of success on the merits, her harm is not irreparable, and the public interest would not be served by such equitable action.

19

Respectfully submitted this 11th of May, 2020.

**RON DESANTIS**
**GOVERNOR**

*/s/ Colleen M. Ernst*
*Colleen M. Ernst* (FBN 112903)
DEPUTY GENERAL COUNSEL
*Joseph W. Jacquot* (FBN 189715)
GENERAL COUNSEL
*Joshua E. Pratt* (FBN 119347)
ASSISTANT GENERAL COUNSEL
Executive Office of the Governor
The Capitol, PL-05
Tallahassee, Florida 32399-0001
Phone: (850) 717-9310
Joe.Jacquot@eog.myflorida.com
Colleen.Ernst@eog.myflorida.com
Joshua.Pratt@eog.myflorida.com

*Counsel for Governor DeSantis*

Edward M. Wenger (FBN 85568)
Hopping Green & Sams, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax: (850) 224-8551
edw@hgslaw.com

*Counsel for Governor DeSantis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF system, which provides notice to all parties, on this 11th day of May, 2020.

<u>/s/ *Colleen M. Ernst*</u>
Colleen M. Ernst
DEPUTY GENERAL COUNSEL